**IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION**

| | | |
|---|---|---|
| **THERMOLIFE INTERNATIONAL, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HI-TECH PHARMACEUTICALS, INC.; JARED WHEAT; A1 SUPPLEMENTS, INC.; DPS NUTRITION; SUPPLEMENT CENTRAL; I-SUPPLEMENTS.COM; EVITAMINS; SUPPZ, INC.; SUPPLEMENTWAREHOUSE.COM; ISLAND SUPPLEMENTS; NETNUTRI; MUSCLE FOODS USA; BLACK DIAMOND SUPPLEMENTS; and NUTRITION JUNGLE,**<br><br>**Defendants.** | ) | **CASE NO.: 1:15-cv-00892-ELR**<br><br>**JURY TRIAL DEMANDED** |

**HI-TECH PHARMACEUTICALS, INC.'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, AND FIRST AMENDED COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**

COMES NOW, Hi-Tech Pharmaceuticals, Inc. ("Hi-Tech"), Defendant in the above-styled action, and for its Answer to Plaintiff's First Amended Complaint and Affirmative Defenses, and First Amended Counterclaims, and Third-Party Complaint respectfully shows this Court as follows:

## ANSWER TO FIRST AMENDED COMPLAINT

### I. PARTIES

1. Hi-Tech is without knowledge or information sufficient to form a belief as to whether Plaintiff is a limited liability organized and existing under the laws of Arizona, with a place of business at 1811 Ocean Front Walk in Venice, California, 90291 and, therefore, denies same. Hi-Tech denies Plaintiff is a leading manufacturer in the sports nutrition and supplement industry.

### A. Manufacturer/Distributor Defendants

2. Hi-Tech denies it offers to sell and sells products, including Jack'd Up and Phosphagen, through the website https://hitechpharma.com/index.htm. Hi- Tech admits the remaining allegations contained in this Paragraph of Plaintiff's First Amended Complaint.

3. Denied.

4. Denied.

5. Admitted that Hi-Tech conducts business activities within this District, which include but are not limited to the formulation, manufacture, offer to sell, and sale of dietary supplement products, including a product sold under the "Jack'd Up" brand name. Hi-Tech denies all remaining allegations contained in this Paragraph of Plaintiff's First Amended Complaint including,

but not limited to, all allegations concerning Jared Wheat and all allegations concerning Hi-Tech and Jared Wheat collectively.

6. Hi-Tech admits it directly or though intermediaries makes, manufactures, ships, distributes, advertises, markets, offers for sale, and/or certain products within this District. Hi-Tech denies it currently sells each of the subject products to each of the Co-Defendants. Hi-Tech denies all remaining allegations contained in this Paragraph of Plaintiff's First Amended Complaint including, but not limited to, all allegations concerning Jared Wheat and all allegations concerning Hi-Tech and Jared Wheat collectively.

7. Hi-Tech admits that Defendant Jared Wheat is the sole owner, president, chief executive officer, secretary, and treasurer of Hi-Tech. Hi-Tech denies the remaining allegations contained in this Paragraph of Plaintiff's First Amended Complaint.

8. Denied. The patent applications speak for themselves.

**B. Retailer Defendants**

9. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

10. Hi-Tech is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

11. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

12. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

13. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

14. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

15. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

16. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of

Plaintiff's First Amended Complaint and, therefore, denies same.

17. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

18. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

19. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

20. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

21. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

22. Hi-Tech denies it has a "supply/purchase contract" with Retailer Defendants. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this

Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

23. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

## II. JURISDICTION, VENUE, AND JOINDER

24. Admitted that the Complaint purports to arise out of the laws of the United States, Title 35 of the United States Code. Hi-Tech denies the remaining allegations contained in this Paragraph of Plaintiff's First Amended Complaint.

25. Admitted that this Court has personal jurisdiction over Hi-Tech and that Hi-Tech and Jared Wheat are citizens of Georgia. Hi-Tech further admits that it has sold certain products in the State of Georgia. Hi-Tech denies the remaining allegations contained in this Paragraph of Plaintiff's First Amended Complaint.

26. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

27. Admitted.

28. Denied.

## III. FACTUAL BACKGROUND

29. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

30. Hi-Tech admits that the '531 and '187 patents are undergoing re-examination before the United States Patent and Trademark Office. Hi-Tech denies the remaining allegations contained in this Paragraph of Plaintiff's First Amended Complaint.

31. Denied.

### A. Direct Infringement

32. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

33. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

34. Denied.

35. Denied.

36. Denied.

37. Denied. Hi-Tech's labels speak for themselves.

38. Denied. Hi-Tech's labels speak for themselves.

39. Denied. Hi-Tech's labels speak for themselves.

40. Denied. Hi-Tech's labels speak for themselves.

41. Denied. Hi-Tech's labels speak for themselves.

42. Denied.

43. Denied that Hi-Tech makes any infringing claims and that each of the advertisements attached as Exhibit E are that of Hi-Tech. Hi-Tech's labels and advertisements speak for themselves.

44. Denied.

45. Denied.

**B. Indirect Infringement**

46. Denied.

47. Hi-Tech is without knowledge or sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Admitted that Plaintiff sent communications to Hi-Tech to notify Hi-Tech of the patents-in-suit. Admitted that, upon information and belief, Plaintiff copied retailers and distributors of Hi-Tech, including but not limited to Co-Defendants, on its communication dated March 17, 2015. All other allegations in this Paragraph of Plaintiff's First Amended Complaint are denied.

59. Denied.

60. Denied.

61. Denied.

## **V. FIRST CAUSE OF ACTION**

62. Hi-Tech repeats and realleges its responses to the allegations of

the foregoing paragraphs as if fully set forth herein.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

72. Denied. Hi-Tech's labels and advertisements speak for themselves.

73. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. Denied.

## V. <u>SECOND CAUSE OF ACTION</u>

82. Hi-Tech repeats and realleges its responses to the allegations of the foregoing paragraphs as if fully set forth herein.

83. Denied.

84. Denied.

85. Denied.

86. Denied.

87. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

88. Denied.

89. Denied.

90. Denied.

91. Denied.

92. Denied. Hi-Tech's labels and advertisements speak for themselves.

93. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

94. Denied.

95. Denied.

96. Denied.

97. Denied.

98. Denied.

99. Denied.

100. Denied.

101. Denied.

## VI. THIRD CAUSE OF ACTION

102. Hi-Tech repeats and realleges its responses to the allegations of the foregoing paragraphs as if fully set forth herein.

103. Denied.

104. Denied.

105. Denied.

106. Denied.

107. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

108. Denied.

109. Denied.

110. Denied. Hi-Tech's labels and advertising speak for themselves.

111. Denied.

112. Denied.

113. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

114. Denied.

115. Denied.

116. Denied.

117. Denied.

118. Denied.

119. Denied.

120. Denied.

121. Denied.

## VII. <u>FOURTH CAUSE OF ACTION</u>

122. Hi-Tech repeats and realleges its responses to the allegations of the foregoing paragraphs as if fully set forth herein.

123. Denied.

124. Denied.

125. Denied.

126. Denied.

127. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's First Amended Complaint and, therefore, denies same.

128. Denied.

129. Denied.

130. Denied.

131. Denied.

132. Denied.

133. Hi-Tech is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this Paragraph of Plaintiff's

First Amended Complaint and, therefore, denies same.

134. Denied.

135. Denied.

136. Denied.

137. Denied.

138. Denied.

139. Denied.

140. Denied.

141. Denied.

142. Hi-Tech admits the ‘074 Patent is currently undergoing reexamination by the United States Patent and Trademark Office. Hi-Tech denies all remaining allegations in this Paragraph of Plaintiff’s First Amended Complaint.

## VIII. FIFTH CAUSE OF ACTION

143. Hi-Tech repeats and realleges its responses to the allegations of the foregoing paragraphs as if fully set forth herein.

144. Denied.

145. Hi-Tech admits that Defendant Jared Wheat is the sole owner, president, chief executive officer, secretary, and treasurer of Hi-Tech. Hi-Tech

denies the remaining allegations contained in this Paragraph of Plaintiff's First Amended Complaint.

146. Denied.

147. Denied.

148. Denied.

149. Denied.

150. Denied.

151. Denied.

Any allegations not specifically admitted herein are denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Hi-Tech has not engaged in any acts constituting infringement of any valid and enforceable claim of any of the patents-in-suit.

### THIRD AFFIRMATIVE DEFENSE

The patents-in-suit are invalid for failure to comply with the statutory requirements for patentability and validity set forth in Title 35 of the United

States Code including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

**FOURTH AFFIRMATIVE DEFENSE**

ThermoLife is not entitled to any relief or recover under the doctrines of laches, waiver and/or estoppel.

**FIFTH AFFIRMATIVE DEFENSE**

ThermoLife is not entitled to any relief by reason of Ron Kramer's unclean hands in acquiring patent rights that Ron Kramer knew, on information and belief, to be invalid, unenforceable, and/or not infringed because of, among other things, obviousness, prior use, and/or patent misuse.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiff is not entitled to any relief because it has unclean hands.

**SEVENTH AFFIRMTIVE DEFENSE**

Ron Kramer and/or Alexander Nikolaidis' representations, arguments and amendments during the prosecution of the patents-in-suit estop ThermoLife from asserting a claim scope that covers any product made, used, sold, and/or offered for sale by Hi-Tech.

**EIGHTH AFFIRAMTIVE DEFENSE**

ThermoLife is not entitled to any equitable relief because it has a

complete and adequate remedy at law.

**NINTH AFFIRMATIVE DEFENSE**

ThermoLife's claims are barred because they are unenforceable pursuant to the doctrine of inequitable conduct.

**FIRST AMENDED COUNTERCLAMS AGAINST THERMOLIFE INTERNATIONAL, LLC AND THIRD-PARTY COMPLAINT AGAINST RON KRAMER**

COMES NOW, the Counter-Plaintiff, Hi-Tech Pharmaceuticals, Inc. ("Hi-Tech"), pursuant to Fed. R. Civ. P. 13, and pleads this First Amended Counterclaim against ThermoLife International, LLC, and also files this First Amended Third-Party Complaint against Ron Kramer ("ThermoLife" and "Kramer" or "Counter-Defendants," collectively), respectfully showing this Court as follows:

**THE PARTIES**

1. Plaintiff Hi-Tech Pharmaceuticals, Inc., ("Hi-Tech") is corporation organized and existing under the laws of the State of Georgia, with its principal place of business located at 6015-B Unity Drive, Norcross, Georgia, 30071. Hi- Tech is a leading manufacturer of dietary supplement products and sells, distributes, and markets its products throughout the United States and to other countries.

2. ThermoLife International, LLC ("ThermoLife") is allegedly incorporated in Arizona with a place of business at 1181 Ocean Front Walk, Venice, California 90291. ThermoLife lists its domestic physical address as 1334 East Chandler Boulevard, #5-D76, Phoenix, Arizona 85048 with the Arizona Corporation Commission and states it can be served with process at this address. However, this address is not a physical location, but merely a post office box.

3. Upon information and belief, ThermoLife does not maintain a place of business or keep assets within the State of Georgia.

4. Ron Kramer ("Kramer") is the President, Chief Executive Officer, and sole owner of ThermoLife and a resident of the State of Arizona. Upon information and belief, Kramer can be served with service of process at 3815 West Lawrence Road, Phoenix, Arizona 85019.

**JURISDICTION, VENUE, AND JOINDER**

5. This Court has subject matter jurisdiction over these Counterclaims pursuant to 15 U.S.C § 1331 (federal question), 15 U.S.C § 1121 (Lanham Act claims), 28 U.S.C. 1338 (patent claims); 28 U.S.C. §§ 2201 and 2203 (declaratory judgment); 28 U.S.C § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1332 (diversity), because this action is between

citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000.00).

6. This Court has personal jurisdiction over ThermoLife, and venue in this District is proper under 28 U.S.C. § 1391, at least because ThermoLife brought its Complaint against Hi-Tech in this District, and these Counterclaims arise, in large part, from the same operative facts as the Complaint.

7. This Court has personal jurisdiction over Kramer pursuant to O.C.G.A. § 9-10-91 because he, in person or through an agent, has committed tortious acts and omissions within this State and/or has caused tortious injury within this State while engaging in a persistent course of conduct within this State.

8. This Court also has personal jurisdiction over Kramer because he purposefully directed and targeted his activities, as set forth herein, at Georgia resident Hi-Tech, and the effects of those activities arose in Georgia.

9. Joinder of Kramer is proper under Rule 20 if the Federal Rules of Civil Procedure because Hi-Tech's right to relief is asserted against Counter-Defendants jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences. This

action also gives rise to common questions of fact and law common to all Counter- Defendants.

## FACTUAL ALLEGATIONS

10. This action seeks redress for Counter-Defendants' fraudulent and defamatory conduct, which also constitutes unfair and deceptive business practices, unfair competition and illegal interference with Hi-Tech's business relations.

11. This action further seeks redress for Counter-Defendants' conspiracy to perform this defamatory and fraudulent conduct, rendering Counter-Defendants jointly and severally liable to Hi-Tech under the law.

12. This action also seeks redress for Counter-Defendants' violation of Georgia's Racketeer Influenced and Corrupt Organizations Act ("RICO") in utilizing ThermoLife as a RICO enterprise.

13. This action also seeks redress for Counter-Defendants' violation of federal antitrust laws.

### I. "PATENT TROLLS" AND THE BUSINESS OF LITIGATION.

14. Pursuant to 35 U.S.C. § 101, any person who "invents or discovers any new and useful process, machine, manufacture, or composition

of matter, or any new and useful improvement thereof, may obtain a patent," subject to the conditions and requirements of the law.

15. Among other requirements for patentability, an invention cannot be patented if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 5 U.S.C. § 102.

16. In patent parlance, the term "otherwise available to the public" also refers to other types of public disclosures of the claimed invention such as, for example, an oral presentation at a scientific meeting, a demonstration at a trade show, a lecture or speech, a statement made on a radio talk show, a YouTube™ video, or a website or other online material.

17. Moreover, the subject matter sought to be patented must be sufficiently different from what has been used or described before that it may be said to be non-obvious to a person having ordinary skill in the area of technology related to the invention. 5 U.S.C. § 103.

18. Although patent examiners for the U.S. Patent and Trademark Office ("USPTO") review patent applications, not all applications approved by the examiners actually meet the legal requirements for patentability. Such erroneously approved patents may later be deemed invalid.

19. According to an April 10, 2015 audit report by the Office of the Inspector General:

> Ensuring the issuance of high-quality patents has been a USPTO strategic initiative for many years. High-quality patents are generally considered to be those whose claims clearly define and provide clear notice of their boundaries, while low-quality patents are those that contain unclear property rights, overly broad claims, or both. Increasing concerns regarding abusive patent litigation and ambiguous patents heightens the need for USPTO to ensure adequate processes are in place to promote issuing high-quality patents.

*USPTO Needs to Strengthen Quality Assurance Practices* – Final Report no. OIG- 15-026-A, Office of Inspector General, p. 1 (April 10, 2015).

20. The Office of the Inspector General recently audited the USPTO's patent quality assurance practices and found, among other things, that the USPTO's policies and procedures are ineffective at measuring whether examiners are issuing high-quality patents, and that the USPTO's official quality metrics may under-represent the true error rate. See generally *Id.*

21. Indeed, the Inspector General's report suggests that due to the nature of financial incentives given to patent examiners by the USPTO, examiners tend to issue more patents they label "high-quality" even if the patents are not. *See Id.*, p. 19.

22. The erroneous over-approval of patent applications, or "rubber-

stamping," by the USPTO can lead to abusive patent litigation by those applying for and/or owning the improper patents in question. *See Id.*, p. 9. In other words, the patent owners use the patents solely to enforce intellectual property rights rather than for legitimate commerce.

23. Abusive patent litigation has also been initiated by entities who purchase or otherwise obtain patents, which may or may not be valid, not to actually utilize the invention, but rather for the sole purpose of threatening enforcement for alleged violations of the patent. Such entities are known as "non- practicing entities", or more popularly, "patent trolls".

24. A federal appellate judge and his two prominent co-authors articulated the problems resulting from such abusive litigation:

> The onslaught of litigation brought by "patent trolls" — who typically buy up a slew of patents, then sue anyone and everyone who might be using or selling the claimed inventions — has slowed the development of new products, increased costs for businesses and consumers, and clogged our judicial system.
>
> Their business plan is simple: trolls (intellectual-property lawyers use less evocative terms like "non-practicing entities" and "patent-assertion entities") make money by threatening companies with expensive lawsuits and then using that cudgel, rather than the merits
> of a case, to extract a financial settlement. In the apt summary of President Obama, who on Tuesday announced a plan to stave off frivolous patent litigation, trolls just want to "hijack somebody else's idea and see if they can extort some money."
> …

> In the meantime, vexatious patent litigation continues to grind through our already crowded courts, costing defendants and taxpayers tens of billions of dollars each year and delaying justice for those who legitimately need a fair hearing of their claims. Trolls, in fact, filed the majority of the roughly 4,700 patent suits in 2012 — and many of those were against small companies and start-ups that often can't afford to fight back.

Hon Randall R. Rader, Chien & Hricik, *Make Patent Trolls Pay in Court*, N.Y. Times, Jun. 4, 2013, at A25; http://www.nytimes.com/2013/06/05/opinion/make-patent-trolls-pay-in-court.html.

25. In an attempt to address this type of abusive and frivolous litigation, several states, including Georgia, have passed "anti-patent trolling" statutes. *See, e.g.*, O.C.G.A. § 10-1-770*, et seq.*

## II. COUNTER-DEFENDANTS' BUSINESS AS A PATENT TROLL.

26. ThermoLife purports to be "a leading manufacturer in the sports nutrition and supplement industry." *Complaint*, ¶ 1.

27. In reality, however, ThermoLife does not manufacture any product it sells to consumers and has minimal employees.

28. Moreover, as of the time of this filing, only three of the 11 ThermoLife products displayed on its website are available for sale. All other ThermoLife products on the website are listed as being "out of stock" or

are otherwise unavailable for purchase.

29. Upon information and belief, many or the majority of ThermoLife's products displayed on its website have been "out of stock" or otherwise unavailable for purchase for the past several years.

30. Upon information and belief, ThermoLife also does not currently sell its products through third-party retailers or distributors, as is customary in the industry.

31. ThermoLife, rather, operates it business primarily to sue or threaten to sue manufacturers and retailers in the industry for alleged patent infringement relating to the manufacturer or retailers' sale of their own products.

32. Upon information and belief, ThermoLife is therefore nothing more than a sham corporation used by Kramer to function as a "patent troll," using its three products to effectuate its coercive purposes. Indeed, upon information and belief, there is such unity of interest and ownership that separate personalities of ThermoLife and Kramer no longer exist.

33. Since 2011, Counter-Defendants have filed dozens of lawsuits against dietary supplement manufacturers and retailers for alleged patent infringement. In 2013 alone, Counter-Defendants were the third most litigious plaintiff in patent cases filed in federal court, with 117 new cases filed. *See,*

https://www.law.berkeley.edu/files/2013_Patent_Litigation_Year_in_Review_Full_Report_(MLex_Machina).pdf. Counter-Defendants have filed these suits in various jurisdictions across multiple states.

34. However, upon information and belief, Counter-Defendants have not yet obtained a single verdict or judgment (except via default judgments) wherein it was adjudicated that anyone has infringed upon one of Counter-Defendants' patents.

35. Upon information and belief, Counter-Defendants filed the numerous lawsuits against dietary supplement manufacturers and retailers for the sole purpose of coercing settlements and licensing agreements and have, as a result, made money from the coercion.

## III. COUNTER-DEFENDANTS' FRAUDULENT LAWSUITS AGAINST HI-TECH FOR ALLEGED PATENT INFRINGEMENT

36. Upon information and belief, Kramer participated in, directed, controlled, caused, ratified, and/or was the moving force behind several previous meritless and fraudulent lawsuits against Hi-Tech, and the circulation of related false, misleading, and defamatory representations to third parties as set forth herein.

37. Indeed, Kramer his significant personal animosity towards Jared

Wheat, as evidenced by Kramer's blog posts on the ThermoLife website:

> [Hi-Tech owner and CEO] Jared Wheat (scum of the earth) … and quite a few others soon to be named are all going to get the legal equivalent of getting f****ed in the a** with a rusty pipe and then kicked in the face till their teeth are implanted in their skulls for stealing from ThermoLife. Mark my words.

ThermoLife International Forums, Jan. 7, 2015, formerly available at http://web.archive.org/liveweb/http://www.ThermoLife.com/forum/t2446-13/ (censorship added).

38. Another of Kramer's blog posts reads as follows:

> If you go big game hunting in Africa there is an argument whether the lion, the African elephant, the leopard, or the white rhinoceros is the biggest prize BUT if you are hunting scumbags in the dietary supplement industry there is no mistake who has that title. No, it is not Jack Owack, its not even Rich Gaspari (now that he had his company taken from him he is not even relevant), the title of the biggest scum bag in the dietary supplement industry belongs to Jared Wheat of Hi-Tech Pharmaceuticals …

(formerly available on ThermoLife International Forums, March 30, 2015).

39. Kramer has also written statements indicating that he will profit from the proceeds of patent litigation filed against competitors:

> Now thanks to Dan Pierce, Mr. Gayspari [sic] and company are going to have to pay me more damages for the sales of all Super Pump Max from the time we put them on notice until the time this new case settles … for infringing on yet 2 more patents owned by ThermoLife …

ThermoLife International Forums, June 21, 2013, formerly available at http://web.archive.org/liveweb/http://www.thermolife.com/forum/t2446-13/.

### A. Counter-Defendants' First Suit Against Hi-Tech for Alleged Patent Infringement: ThermoLife International, LLC v. Hi-Tech Pharmaceuticals, Inc., United States District Court for the District of Arizona, Case 2:12-cv-01466.

40. On or about July 6, 2012, ThermoLife filed suit against Hi-Tech for allegedly infringing ThermoLife's U.S. patent numbers 7,777,074 ("the '074 Patent") and 8,178,572 ("the '572 Patent").

41. Counter-Defendants filed that suit in the District Court for the District of Arizona, Case 2:12-cv-01466, ("Arizona litigation") and in the course of and in furtherance of the litigation, sent or caused to be sent correspondence, pleadings, and other documents via U.S. mail and/or other interstate carrier into interstate commerce.

42. In the course of and in furtherance of the Arizona litigation, Counter- Defendants sent or caused to be sent correspondence, pleadings, and other documents via email or other electronic submission into interstate commerce.

43. According to the patents, which were purportedly owned by ThermoLife, Kramer and a man from Greece invented the combination of

Creatine with a nitrate, or Creatine Nitrate, for use as a dietary supplement.

44. Specifically, the ‘074 Patent purported to cover the invention of the Creatine Nitrate compound, among other amino acid compounds. The ‘572 Patent purported to cover the use of Creatine Nitrate, among other amino acid compounds, for use of improving circulation and the absorption of amino acids in the body.

45. The ‘572 Patent is therefore dependent upon, or derivative of, the ‘074 Patent.

46. In the Complaint in the Arizona lawsuit, Counter-Defendants fraudulently alleged that Hi-Tech infringed upon these patents because it manufactured and/or sold dietary supplement products containing Creatine Nitrate.

47. Upon information and belief, however, ThermoLife itself did not and does not manufacture or sell any product containing Creatine Nitrate.

48. Prior to the Arizona lawsuit, a third-party unrelated to Hi-Tech requested in 2010 that the USPTO reexamine the validity of the ‘074 Patent at issue in the Arizona lawsuit. The third-party’s request for reexamination included, but was not limited to, ThermoLife’s claim regarding the invention of Creatine Nitrate.

49. The USPTO reexamined the ‘074 Patent in response to these requests and, in a detailed “Final Rejection” dated April 2, 2014, rejected ThermoLife’s claim concerning the invention of Creatine Nitrate, deeming ThermoLife’s patent of Creatine Nitrate invalid.

50. The USPTO rejected the Creatine Nitrate patent claim, in part, because the combination of Creatine with a nitrate was “obvious” in light of scientific publications preceding the patent, which laid out how the compound would be nutritionally useful while more stable and better tasting than an amino acid alone (in a dietary supplement for instance), and because the Creatine Nitrate compound was described in a scientific publication as far back as 1914.

51. In the “Final Rejection,” the USPTO not only rejected ThermoLife’s patent claims relating to the combination of a nitrate or nitrite with Creatine (e.g. Creatine Nitrate), but also the combination of a nitrate or nitrite with the following amino acids: Agmaine, Beta-Alanine, Citrulline, Glutamine, Isoleucine, Norvaline, and Ornithine.

52. Despite the detailed bases on which the USPTO rejected ThermoLife’s patent claim relating to Creatine Nitrate, ThermoLife appealed the Final Rejection, which currently remains pending at the appellate level in the USPTO.

53. The Arizona litigation against Hi-Tech is stayed pending the same appeal at the USPTO.

54. In filing the Arizona lawsuit against Hi-Tech, Counter-Defendants falsely implied that ThermoLife or its counsel had performed an adequate pre-suit investigation to determine likely infringement and/or the validity of the '074 and '572 Patents.

55. Neither Counter-Defendants nor their counsel, however, performed such a pre-suit investigation because an adequate investigation would have revealed the invalidity of the '074 and '572 Patents.

56. In the alternative, Counter-Defendants and/or their counsel did perform an adequate pre-suit investigation to determine likely infringement or the validity of the '074 and '572 Patents and confirmed the invalidity of the'074 and '572 Patents, but nonetheless elected to file suit against Hi-Tech and other defendants - despite their knowledge of the Patents' legal invalidity.

57. In sum, Counter-Defendants' assertions and legal claims on the basis of the '074 and '572 Patents were knowingly false and objectively and subjectively baseless because the'074 and '572 Patents were not valid, and Counter-Defendants knew or should have known that to be the truth.

58. In filing the Arizona lawsuit Counter-Defendants knowingly made

fraudulent statements concerning Hi-Tech's alleged infringement of the '074 and

59. '572 Patents with the intent to mislead the Court and the public and wrongfully obtain settlement monies and/or licensing fees from Hi-Tech.

60. Counter-Defendants also made false and misleading statements concerning Hi-Tech's alleged infringement of the '074 and '572 Patents in correspondence with Hi-Tech's customers and third parties in bad faith and with the intent to defame Hi-Tech and wrongfully interfere with Hi-Tech's business and business relationships.

61. As a result of Counter-Defendants' defamatory communications to Hi-Tech's customers and third parties and its fraudulent allegations in the Arizona lawsuit as set forth herein, Hi-Tech has sustained damages in the form of attorney fees and litigation costs, lost business opportunities, damage to its reputation, and other damages in an amount to be determined at trial.

**B. Counter-Defendants' Second Suit Against Hi-Tech for Alleged Patent Infringement: *ThermoLife International, LLC v. Better Body Sports, et al.*, United States District Court for the Central District of California, Case 2:12-cv- 09229.**

62. On or about September 21, 2012, Counter-Defendants, through counsel, mailed or caused to be mailed into interstate commerce a letter to Hi-Tech containing false and misleading assertions that Hi-Tech was violating ThermoLife patent number 8,202,908 ("the '908 Patent") entitled

"D-Aspartic Acid Supplement."

63. Upon information and belief, however, ThermoLife does not sell any product containing D-Aspartic Acid.

64. On or about October 5, 2012, Hi-Tech responded to Counter-Defendants' letter, directing their attention to a preexisting Italian patent ("the Italian Patent"), which rendered the '908 patent legally invalid. In doing so, Hi-Tech provided Counter-Defendants with the details of the Italian Patent, including its application number, title, and filing date.

65. Nevertheless, on or about October 26, 2012, Counter-Defendants filed another lawsuit against Hi-Tech, and several other entities in the dietary supplement industry in the Central District of California, Case 2:12-cv-09229, ("Central California litigation") fraudulently alleging infringement of the '908 Patent.

66. In the Central California litigation, ThermoLife was represented by the Newport Trial Group, a California law firm that two years earlier had previously filed a complaint against ThermoLife on behalf of a plaintiff who alleged that ThermoLife was engaged in false patent marketing.

67. Counter-Defendants filed the Central California lawsuit falsely alleging infringement of the '908 Patent and, in the course of and in furtherance

of that litigation, sent or caused to be sent correspondence, pleadings, and other documents via mail and/or other interstate carrier into interstate commerce.

68. In the course of and in furtherance of the Central California litigation, Counter-Defendants also sent or caused to be sent correspondence, pleadings, and other documents via email and/or other electronic submission into interstate commerce.

69. The defendants in the Central California litigation filed a motion for summary judgment against ThermoLife on the basis that the preexisting Italian Patent – the very same patent referenced in Hi-Tech's pre-suit letter to Counter-Defendants – rendered the '908 Patent invalid.

70. Consistent with Hi-Tech's pre-suit correspondence to Counter-Defendants, the District Court for the Central District of California decreed the '908 Patent invalid in light of the Italian Patent, and entered final judgment in favor of the defendants, including Hi-Tech.

71. In sending Hi-Tech the September 21, 2012 demand letter to Hi-Tech and filing suit against Hi-Tech, Counter-Defendants falsely and misleadingly implied that Counter-Defendants or their counsel had performed an adequate pre-suit investigation to determine likely infringement and/or the validity of the '908 Patent.

72. Neither Counter-Defendants nor their counsel, however, performed such a pre-suit investigation because an adequate investigation would have revealed the invalidity of the ‘908 Patent.

73. In the alternative, Counter-Defendants and/or their counsel did perform an adequate pre-suit investigation to determine likely infringement and/or the validity of the ‘908 Patent and discovered the invalidity of the ‘908 Patent, but nonetheless elected to file suit against Hi-Tech and other defendants despite knowledge of the ‘908 Patent’s invalidity.

74. In sum, Counter-Defendants’ assertions and legal claims on the basis of the ‘908 Patent in the Central California litigation were objectively and subjectively baseless and thus fraudulent because the ‘908 Patent was not valid, and Counter-Defendants knew or should have known that to be the case.

75. Counter-Defendants made false and misleading statements concerning Hi-Tech’s alleged infringement of the ‘908 Patent in its September 21, 2012 letter, and filed the subsequent lawsuit in the Central District of California in bad faith and with the intent to defraud Hi-Tech, the Court, and the public.

76. Counter-Defendants made false and misleading statements concerning Hi-Tech’s alleged infringement of the ‘908 Patent with the intent to

wrongfully interfere with Hi-Tech's business and business relationships.

77. As a result of Counter-Defendants' false and misleading allegations and fraudulent lawsuit set forth herein, Hi-Tech has sustained damages in the form of attorney fees and litigation costs, including those incurred to defend Hi-Tech and its customer, DNA Sports Nutrition, as well as lost business, business opportunities, damage to its reputation, and other damages in an amount to be determined at trial.

**C. Counter-Defendants' Third Suit Against Hi-Tech for Alleged Patent Infringement: *ThermoLife International, LLC v. Hi-Tech Pharmaceuticals, Inc.,* United States District Court for the Southern District of California, Case 3:13-cv-09229.**

78. Having had no previous success suing upon patents invented by Kramer and/or owned by ThermoLife, on or about April 5, 2013, Counter-Defendants filed yet another lawsuit against Hi-Tech, and several other entities in the dietary supplement industry, containing further false and misleading allegations of infringement of patent numbers 6,646,006; 6,117,872; 5,891,459; and 7,452,916 (the '006, '872, '459, and '916 Patents, respectively) – patents which ThermoLife licensed from The Board of Trustees of the Leland Stanford Junior University ("the Stanford Patents" collectively).

79. Counter-Defendants filed the suit alleging infringement of the Stanford Patents in the Southern District of California, Case 3:13-cv-09229,

("Southern California litigation") and, in the course of and in furtherance of the litigation, sent or caused to be sent correspondence, pleadings, and other documents via mail and/or other interstate carrier into interstate commerce.

80. In the course of and in furtherance of the Southern California litigation, Counter-Defendants sent or caused to be sent correspondence, pleadings, and other documents via email and/or other electronic submission into interstate commerce.

81. As part of the Southern California litigation, Counter-Defendants alleged that the Stanford Patents cover specifically listed ingredients for certain purposes, and that the defendants' inclusion of these ingredients in their products constitutes infringement of the Stanford Patents.

82. Upon information and belief, Counter-Defendants purchased licenses with respect the Stanford Patents for the sole purpose of using them as a basis upon which to bring fraudulent lawsuits against entities in the dietary supplement industry, including Hi-Tech.

83. This lawsuit remains pending in the District Court for the Southern District of California, and Hi-Tech contends the subject patents are invalid and/or that Hi-Tech has not otherwise infringed said patents.

84. As a result of Counter-Defendants' fraudulent lawsuit set forth

herein, Hi-Tech has sustained damages in the form of attorney fees and litigation costs, lost business opportunities, damage to its reputation, and other damages in an amount to be determined at trial.

### D. Counter-Defendants' Fourth, Fifth, and Sixth Suits Against Hi- Tech for Alleged Patent Infringement: *ThermoLife International, LLC v. Hi-Tech Pharmaceuticals, Inc., et al.* United States District Court for the Northern District of Georgia, Cases 1:15-cv-00892, 1:15-cv-00893, 1:15-cv-00894.

a. Counter-Defendants' February 10, 2014 Demand Letter to Hi-Tech and Hi-Tech's Response

85. On or about February 10, 2014, Counter-Defendants, through counsel, sent or caused to be sent into interstate commerce, via email, a demand letter to Hi- Tech containing false and misleading assertions that Hi-Tech was violating ThermoLife patents 8,178,572; 7,777,074 (the same patents at issue in the stayed Arizona litigation, the '074 Patent being the one deemed invalid by the USPTO); and 8,183,288. The letter further falsely asserted that Hi-Tech was violating ThermoLife patent pending application numbers 8,455,531 and 8,466,187. Counter-Defendants' letter also contained website links, which purportedly provided "notice" of the patents and patent applications.

86. In this letter, Counter-Defendants made multiple demands of Hi-Tech including, but not limited to, demands that Hi-Tech stop selling certain products, remove all marketing and advertising materials for the products, and

provide Counter-Defendants with information on the products made, sold, and inventoried. Counter-Defendants also threatened to sue Hi-Tech for its alleged infringement. Counter-Defendants did not, however, provide any explanation as to how Hi-Tech's products allegedly infringed upon the patents and patent applications in question.

87. Hi-Tech responded to this demand letter on or about February 18, 2014, informing Counter-Defendants that the website links providing "notice" did not open, and requesting information on which of the 126 claims of the five patents or patent applications were allegedly infringed upon by Hi-Tech's products.

88. Counter-Defendants, however, never responded to this letter or Hi-Tech's inquiries.

89. Upon information and belief, Counter-Defendants made false and misleading statements concerning Hi-Tech's alleged infringement of the aforementioned patents and patent applications in bad faith and with the intent to wrongfully obtain settlement monies and/or licensing fees from Hi-Tech.

2. Counter-Defendants' March 17, 2015 Demand Letter to Hi-Tech and Hi-Tech's Customers

90. On or about March 17, 2015, approximately one year after Counter- Defendants' last correspondence, Counter-Defendants, through

counsel, sent or caused to be sent into interstate commerce via interstate carrier a demand letter to Hi-Tech containing false and misleading assertions that "Hi-Tech/APS" was violating ThermoLife patent numbers 8,445,531; 8,466,187; 8,183,288; and 8,178,572 (the '531, '187, '288, and '572 Patents, respectively).

91. In this letter, Counter-Defendants made multiple demands of Hi-Tech including, but not limited to, demands that Hi-Tech stop selling at least five of its major products, provide written confirmation to ThermoLife that Hi-Tech has removed marketing and advertising materials for the products, provide ThermoLife with information on the quantities of the products sold, and that Hi-Tech hold all remaining inventory of the products.

92. The letter further represented that ThermoLife was the exclusive source for the type of products allegedly covered by the Patents and/or that use of the ingredients allegedly covered by the Patents was only permissible through a license from ThermoLife.

93. The letter also represented that ThermoLife was providing an "Initial Infringement Review," but such "Review" was legally insufficient and conclusory.

94. The March 17, 2015 letter indicated that, in the event Hi-Tech met these demands, Counter-Defendants would be willing to discuss negotiating a

resolution of the issues (i.e. resolution through Hi-Tech's payment of settlement monies and/or licensing fees). The letter further stated that, if Hi-Tech did not meet the demands, Counter-Defendants would sue Hi-Tech and Hi-Tech's customers who sold the subject products.

95. Upon information and belief, Counter-Defendants sent or caused to be sent into interstate commerce a copy of the above-described March 17, 2015 letter to a number of Hi-Tech's distributors and retail customers including, but not limited to, A1 Supplements, Inc. DPS Nutrition, Supplement Central, I-Supplements.com, I'llpumpyouupcom, Evitamins, Suppz, Inc., SupplementWarehouse.com, Island Supplements, Netnutri, Muscle Foods USA, Black Diamond Supplements, Nutrition Jungle, APS Nutrition, World Class Nutrition, All Star Health, Lockout Supplements, Netrition, Inc., Europa Sports Nutrition, and the Kroger Company.

96. Counter-Defendants may have also sent the defamatory letter to other customers of Hi-Tech, but Hi-Tech does not currently know the full extent of Counter-Defendants' mailings.

97. As a direct result of this letter being sent to Hi-Tech's customers, certain retailers and distributors including the Kroger Company, Vitacost.com, Inc., and Europa Sports Nutrition, have notified Hi-Tech they will not be selling

the subject Hi-Tech products until, at least, the current litigation against Hi-Tech in the Northern District of Georgia is resolved.

98. Upon information and belief, as a direct result of this letter being sent to Hi-Tech's customers, Hi-Tech has also lost product sales to other customers that did not affirmatively notify Hi-Tech they would be discontinuing sales.

99. As a direct result of this defamatory letter being sent to Hi-Tech's customers, the Kroger Company, Vitacost.com, Inc., and their respective companies, affiliates, employees, officers, and directors, have requested that Hi-Tech defend, indemnify, and hold harmless these entities and persons against any related patent infringement litigation by ThermoLife.

100. Upon information and belief, Counter-Defendants made false and misleading statements concerning Hi-Tech's alleged infringement of the aforementioned patents in bad faith and with the intent to wrongfully obtain settlement monies and/or licensing fees from Hi-Tech, to defame Hi-Tech, and to wrongfully interfere with Hi-Tech's business and business relationships.

101. As a result of Counter-Defendants sending their March 17, 2015 letter to Hi-Tech's customers, Hi-Tech has suffered damages in the form of lost sales and profits, lost business opportunities, damage to its reputation, potential

legal fees and litigation costs to defend its customers against suits by ThermoLife, and other damages in an amount to be determined at trial.

3. <u>The Three Lawsuits Against Hi-Tech and Hi-Tech Customers in the District Court for the Northern District of Georgia.</u>

102. On or about March 27, 2015, ThermoLife filed three suits against Hi- Tech, falsely claiming Hi-Tech infringed upon ThermoLife's patent numbers 8,455,531; 8,466,187; 8,183,288 (the '531, '187, and '288 Patents, respectively) ("the patents-in-suit," collectively).

103. Hi-Tech is the only Defendant common to the three suits, and the other named Defendants are 17 of Hi-Tech's customers, which allegedly infringed upon ThermoLife's patents by selling various Hi-Tech products.

104. According to the patents in question, Kramer and the aforementioned man from Greece invented compounds using certain amino acids in combination with a nitrate or nitrite for various dietary supplement purposes.

105. Each of the patents at issue, however, contain claims dependent upon, or derived from, the invention of amino acid compounds rejected as patentable by the USPTO in its April 2, 2014 "Final Rejection" – including, but not limited to, Creatine Nitrate.

106. Thus, each of patents at issue in the current litigation are derivative or dependent upon the ‘074 patent claims already rejected by the USPTO.

107. Moreover, ThermoLife’s allegations of infringement of at least United States Patent No. 8,455,531 (the “‘531 patent”), and similarly as to each patent related thereto, are barred because the ‘531 patent is unenforceable pursuant to 37 C.F.R. § 1.56 and the doctrine of inequitable conduct.

108. The ‘531 patent was filed on March 2, 2011 and granted on June 4, 2013. The listed inventors are Ronald Kramer and Alexander Nikolaidis. The ‘531 patent states that it is assigned to ThermoLife International, LLC. The patent application that resulted in the ‘531 patent was originally filed by the law firm of Booth Udall Fuller, PLC.

109. The ‘531 patent is generally directed to an amino acid composition comprising at least one constituent selected from a nitrate, a nitrite or both, and at least one constituent selected from a group of amino acids. The ‘531 patent is also generally directed to methods for increasing bioabsorption of amino acids and methods for increasing vasodilative characteristics by administering a pharmaceutically effective amount of the claimed amino acid compositions.

110. During prosecution of the '531 patent, the USPTO made an obviousness-type double-patenting rejection based on the ‘074 patent which

issued from a common parent application to the ‘531 patent, and which lists the same inventors and assignee. The ‘531 applicant overcame the rejection by submitting a terminal disclaimer.

111. During the pendency of the ‘531 patent application, reexamination of the ‘074 patent was requested and granted, based on two separate reexamination requests. The first reexamination request (90/011,394) filed on December 17, 2010, was based on references to Ramaswamy, Rajkumar, Petrosyan and McCoy. The second reexamination request (90/011,869) filed on August 18, 2011, was based on a reference to Barger. The two reexaminations were consolidated.

112. The reference to Barger expressly discloses creatine nitrate, which was claimed in the ‘531 patent application. Barger is therefore material prior art to the ‘531 patent application.

113. Thus, the Barger reference was cited to the ‘531 applicant and their counsel in the reexamination of the related ‘074 patent on August 18, 2011, during the pendency of the '531 application. However, Barger was never cited to the USPTO in the ‘531 application.

114. Despite the overlap in subject matter, assignee, and inventors of the ‘074 patent in reexamination, and the ‘531 patent application, the ‘531 patent

applicant did not disclose the Barger reference to the USPTO during prosecution of the application that resulted in the ‘531 patent.

115. 45. As a result, the examiner that considered the novelty and/or validity of the ‘531 patent could not and did not consider whether the invention claimed in the ‘531 patent was patentable over the Barger reference cited to ThermoLife's counsel in the ‘074 reexamination.

116. Upon information and belief, Kramer and others involved in the prosecution of the application that matured into the ‘531 patent intentionally, knowingly, and willfully failed to disclose material prior art during prosecution of the ‘531 patent with the intent to deceive the USPTO and wrongfully extract money from Hi-Tech and its customers. If the individuals involved in the prosecution had disclosed the Barger reference, then the USPTO would have refused to issue the ‘531 patent.

117. As such, the inventors, applicant, counsel, and others involved in the prosecution of the application that matured into the ‘531 patent committed inequitable conduct, and the ‘531 patent is, therefore, unenforceable. The same arguments as to the ‘531 patent are applicable to at least the patents-in-suit that claim the use of creatine, because each is derived from the ‘074 patent.

118. Furthermore, prior to filing the ‘531 and ‘187 patents at issue in this

case, Kramer, ThermoLife, and its counsel submitted a new dietary ingredient application ("NDI") to the FDA for creatine nitrate. In that application, the parties submitted numerous references ("NDI prior art") for the proposition that nitrates are safe. Yet, on information and belief, the NDI and NDI prior art, and in particular its teachings and evidence and statements that nitrates are safe, constitute material, non-cumulative prior art that was never submitted to the USPTO during the prosecution of any of the ThermoLife patents. Moreover, in direct contradiction to statements made in the NDI, ThermoLife and its counsel are now arguing in reexamination proceedings that the prior art teaches one of ordinary skill that nitrates are not safe for use in the human body. In making these arguments, ThermoLife and its counsel continue to fail to disclose the NDI and the NDI prior art to the USPTO.

119. And while several of ThermoLife's patents, including all four Patents-In-Suit, are being reexamined by the USPTO, ThermoLife and Kramer continue to brazenly assert them notwithstanding the fact that they are all likely to be invalidated.

120. Claims contained in the '531 Patent at issue are also invalid on another basis. Specifically, ThermoLife's earlier '288 and '187 Patents already "patent" the use of certain amino acid and nitrate or nitrite compounds for

"increasing the bioabsorption of Amino Acids" and "increasing vasodilative characteristics of Amino Acids."

121. In sending the March 17, 2015 demand letter to Hi-Tech and its customers, and in filing suit against Hi-Tech and its customers, Counter-Defendants falsely implied that Counter-Defendants or their counsel had performed an adequate pre-suit investigation to determine likely infringement and/or the validity of the patents-in-suit.

122. Neither Counter-Defendants nor their counsel, however, performed such a pre-suit investigation because an adequate investigation would have revealed the invalidity of the patents-in-suit.

123. In the alternative, Counter-Defendants and/or their counsel did perform an adequate pre-suit investigation to determine likely infringement and/or the validity of the patents-in-suit and discovered the invalidity of the patents-in-suit but nevertheless elected to file suit against Hi-Tech and its customers despite knowledge of the patents-in-suit's legal invalidity.

124. In sum,' Counter-Defendants' assertions and legal claims on the basis of the patents-in-suit are objectively and subjectively baseless - and thus fraudulent - because the patents-in-suit are not valid, and Counter-Defendants knew or should have known that to be the case.

125. Counter-Defendants have made false and misleading statements concerning Hi-Tech's alleged infringement of the patents-in-suit, and filed the related fraudulent lawsuits and with the intent to wrongfully extract money from Hi-Tech and Hi-Tech's customers, to defame Hi-Tech, and to wrongfully interfere with Hi-Tech's business and business relationships.

126. Hi-Tech denies that it has infringed upon the patents-in-suit and contend that these patents are and were invalid as a matter of law and known to be so by Counter-Defendants.

127. Accordingly, there is an actual, live and justiciable controversy between ThermoLife and Hi-Tech as it relates to the patents.

128. Hi-Tech is entitled to declaratory relief because, although Hi-Tech has not infringed upon the patents-in-suit, Hi-Tech will continue to commercialize products that ThermoLife alleges infringe its patents, even though the patents are not infringed and are invalid.

129. As a result of Counter-Defendants' fraudulent lawsuits set forth herein, Hi-Tech has sustained damages in the form of lost sales and profits, lost business opportunities, damage to its reputation, potential legal fees and litigation costs to defend its customers against suits by ThermoLife, and other damages in an amount to be determined at trial.

## <u>COUNT I</u>

## BAD FAITH ASSERTIONS OF PATENT INFRINGEMENT IN VIOLATION OF O.C.G.A. § 10-1-770, *ET SEQ.*

***Against ThermoLife and Kramer***

130. Hi-Tech incorporates by reference Paragraphs 1 through 129 above as though fully set forth herein.

131. Hi-Tech is a "target" within the meaning of O.C.G.A. § 10-1-770(3), as Counter-Defendants have sent Hi-Tech a demand letter asserting allegations of patent infringement, threatened litigation against Hi-Tech, sued Hi-Tech alleging patent infringement, and sent Hi-Tech's customers copies of a demand letter asserting that Hi-Tech's products infringe a patent or patents.

132. As set forth herein, Hi-Tech's customers are "targets" within the meaning of O.C.G.A. § 10-1-770(3), as ThermoLife has threatened them with litigation alleging patent infringement and/or has filed suit against them alleging patent infringement.

133. As set forth herein, in their March 17, 2015 demand letter and three lawsuits filed against Hi-Tech in this Court, Counter-Defendants made claims or assertions of patent infringement against Hi-Tech, which they knew, or should have known, were meritless and false.

134. Further, in sending their demand letter to Hi-Tech and/or its customers, Counter-Defendants falsely and wrongfully:

a. Represented that Hi-Tech's products infringed upon ThermoLife's patents and patent applications;

b. Represented that certain Hi-Tech products could not be legally sold;

c. Used legal counsel to imply that ThermoLife had performed a sufficient pre-suit investigation, including investigation into the target businesses and their potentially infringing activities, that would be required to justify filing a lawsuit;

d. Represented that ThermoLife was the exclusive source for the type of products allegedly covered by the Patents and/or that use of the ingredients allegedly covered by the Patents was only permissible through a license from ThermoLife;

e. Represented that ThermoLife has a valid cause of action against Hi- Tech's customers unless they discontinue selling certain Hi-Tech products;

f. Targeted small businesses that were unlikely to have the resources to fight patent-litigation, or even pay counsel; and

g. Shifted the entire burden of the pre-suit investigation onto the

small businesses that received the letters.

135. As set forth herein, in their March 17, 2015 demand letter and three lawsuits filed against Hi-Tech in this Court, Counter-Defendants have made false and meritless assertions of patent infringement against Hi-Tech in bad faith.

136. As set forth herein, Counter-Defendants have filed similar lawsuits against Hi-Tech for patent infringement in the past, which courts or the USPTO have subsequently found to be meritless.

137. Despite these circumstances, Counter-Defendants have not only filed the current three lawsuits, but also continue to make false, deceptive, meritless, and bad faith claims of patent infringement in the aforementioned litigation they have refused to dismiss in the District Court for the District of Arizona and the District Court for the Southern District of California.

138. Counter-Defendants acted in bad faith in making the aforementioned assertions in its March 17, 2015 demand letter, and when filing and/or perpetuating the aforementioned lawsuits, such that their actions violate O.C.G.A. § 10-1-771, which prohibits bad faith assertions of patent infringement.

139. Counter-Defendants' actions, including its aforementioned claims,

assertions, and lawsuits alleging patent infringement on the part of Hi-Tech, have proximately caused actual injury to Hi-Tech.

140. Specifically, as set forth herein, Counter-Defendants' actions have caused Hi-Tech to incur lost revenue from sales to retail customers, damage to its reputation, lost business opportunities, and other damages in an amount to be determined at trial.

141. Pursuant to O.C.G.A. § 10-1-773(c), Hi-Tech is entitled to recover general and special damages including restitution, punitive damages, treble damages, attorney fees, expenses of litigation, and other relief as the Court deems just and equitable.

142. Moreover, Counter-Defendants' violative actions, as set forth herein, have caused, and will continue to cause immediate and irreparable injury to Hi- Tech, including but not limited to injury to business, lost revenue and business opportunities, lost income, ability to compete, and goodwill. Hi-Tech, therefore, is entitled to an injunction under O.C.G.A. § 10-1-773(c) restraining Counter- Defendants, their agents, employees, representatives, and all persons acting in concert with them from engaging in or continuing to pursue bad faith claims, assertions, or lawsuits against Hi-Tech with respect to alleged patent infringement. Hi-Tech is also entitled to injunctive relief against Counter-

Defendants requiring Counter-Defendants to issue corrective statements retracting all deceptive and misleading statements to third-parties, including but not limited to Hi-Tech's customers, and the public regarding Hi-Tech's alleged patent infringement.

143. Hi-Tech will also seek to require Counter-Defendants to post a bond for attorneys' fees as provided by O.C.G.A. § 10-1-772.

**COUNT II**

**VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT, O.C.G.A. § 10-1-370, *ET SEQ.***

***Against ThermoLife and Kramer***

144. Hi-Tech incorporates by reference Paragraphs 1 through 143 above as though fully set forth herein.

145. Counter-Defendants' March 17, 2015 demand letter to Hi-Tech's customers falsely and misleadingly claimed or asserted that Hi-Tech was infringing patents owned by ThermoLife and that certain Hi-Tech products could not be legally sold.

146. In sending these demand letters to Hi-Tech's customers, Counter-Defendants disparaged the goods, services, and/or business of Hi-Tech through false and misleading representations of fact as prohibited by O.C.G.A. § 10-1-372(a)(8).

147. Such claims or assertions were and are deceptive or potentially confusing to Hi-Tech's customers.

148. At least one of Hi-Tech's customers has justifiably relied upon ThermoLife's aforementioned false and misleading assertion of Hi-Tech's patent infringement, and has ceased purchasing certain Hi-Tech products.

149. In response to the false and misleading assertions contained in March 17, 2015 demand letter, at least one of Hi-Tech's customers has requested defense and indemnification against suit by ThermoLife.

150. ThermoLife's lawsuits pending in this Court, the District Court for the District of Arizona, and the District Court for the Southern District of California falsely and misleadingly claim or assert that Hi-Tech is infringing patents owned or licensed by ThermoLife.

151. In filing and pursuing these lawsuits, including the lawsuits against Hi-Tech's customers before this Court, Counter-Defendants have disparaged the goods, services, and/or business of Hi-Tech through false and misleading representations of fact as prohibited by O.C.G.A. § 10-1-372(a)(8).

152. Such claims or assertions and were, and are, deceptive or potentially confusing to Hi-Tech's customers and end consumers.

153. Upon information and belief, customers and/or consumers have

relied upon the false and misleading claims and assertions set forth in these lawsuits to cease purchasing Hi-Tech's products and thus causing damage to Hi-Tech.

154. Hi-Tech has sustained, and is likely to sustain in the future, immediate and irreparable damage as a result of Counter-Defendants' March 17, 2015 demand letter to its customers, and as a result of the pending lawsuits, in the form of injury to its business, lost revenue and business opportunities, ability to compete, and the goodwill associated with its products. Hi-Tech, therefore, is entitled to an injunction under O.C.G.A. § 10-1-373(a) restraining Counter-Defendants, their agents, employees, representatives, and all persons acting in concert with them from engaging in or continuing to pursue bad faith claims, assertions, or lawsuits against Hi-Tech with respect to alleged patent infringement. Hi-Tech is also entitled to injunctive relief against Counter-Defendants requiring them to issue corrective statements retracting all deceptive and misleading statements to third-parties, including but not limited to Hi-Tech's customers, and the public regarding Hi-Tech's alleged patent infringement.

155. Pursuant to O.C.G.A. § 10-1-373(b)(2), Hi-Tech is also entitled to recover attorneys fees and costs from Counter-Defendants because they willfully engaged in the deceptive practices set forth herein knowing them to be

deceptive.

## COUNT III

## UNFAIR COMPETITION IN VIOLATION OF LANHAM ACT § 43(a), 15 U.S.C. § 1125(a)

***Against ThermoLife and Kramer***

156. Hi-Tech incorporates by reference Paragraphs 1 through 155 above as though fully set forth herein.

157. As set forth herein, by sending its March 17, 2015 demand letter to Hi-Tech's customers in the marketplace, Counter-Defendants knowingly made and distributed into interstate commerce correspondence containing false or misleading descriptions of fact regarding Hi-Tech and its products.

158. This letter falsely or misleadingly stated or misrepresented to Hi-Tech's customers that:

a. Hi-Tech and its products infringed upon ThermoLife's patents and patent applications;

b. Certain Hi-Tech products could not be legally sold; and

c. ThermoLife was the exclusive source for the type of products allegedly covered by the Patents and/or that use of the ingredients allegedly covered by the Patents was only permissible through a license from ThermoLife.

159. The aforesaid false or misleading statements and misrepresentations of fact, and Counter-Defendants' threats of legal action, were made in bad faith and were intended to create confusion, mistake, and deception among Hi-Tech's customers in the trade and to divert customers of Hi-Tech, and were made willfully and with the intent to deceive.

160. The aforesaid false or misleading statements and misrepresentations of fact actually deceived or is likely to deceive a substantial segment of ThermoLife's intended audience, Hi-Tech's customers.

161. The deception set forth herein is material in that it is likely to influence the purchasing decisions of Hi-Tech's customers.

162. The deception set forth herein affects interstate commerce in that Hi- Tech's customers are in various states, and Hi-Tech sells and distributes its products nationwide.

163. The aforesaid false or misleading statements and misrepresentations of fact result in actual and probable injury to Hi-Tech in the form of lost or diverted sales.

164. Counter-Defendants' false and misleading statements violate the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

165. Counter-Defendants have caused, and will continue to cause,

immediate and irreparable injury to Hi-Tech, including injury to its business, ability to compete, and the goodwill associated with its products for which there is no adequate remedy at law. Hi-Tech, therefore, is entitled to an injunction under

166. 15 U.S.C. § 1116 restraining Counter-Defendants, their agents, employees, representatives, and all persons acting in concert with them from engaging in or continuing to pursue bad faith claims, assertions, or lawsuits against Hi-Tech with respect to alleged patent infringement. Hi-Tech is also entitled to injunctive relief against Counter-Defendants requiring Counter-Defendants to issue corrective statements retracting all deceptive and misleading statements to third-parties, including but not limited to Hi-Tech's customers, and the public regarding Hi- Tech's alleged patent infringement.

167. Pursuant to 15 U.S.C. § 1117, Hi-Tech is entitled to recover from Counter-Defendants the damages sustained by Hi-Tech as a result of Counter-Defendants' acts in violation of Lanham Act § 43(a). Hi-Tech is at present unable to ascertain the full extent of the monetary damages it has suffered by reason of Counter-Defendants' acts but will do so through discovery and trial.

168. Counter-Defendants published the defamatory statements with actual malice and the intent to injure Hi-Tech.

169. Indeed, Counter-Defendants published the defamatory statements about Hi-Tech without any regard for the truth, and with the motivation to profit from those statements.

170. The defamatory information published by Counter-Defendants has injured the standing and business reputation of Hi-Tech, and exposed it to ridicule in the business and public communities.

171. As a result of Counter-Defendants' defamatory actions, Hi-Tech has suffered general and special damages in an amount to be determined at trial, and Counter-Defendants are liable for these damages along with punitive damages under the law.

172. Because Counter-Defendants' defamatory statements interfere with Hi-Tech's property right of doing and conducting business, Hi-Tech is entitled to an injunction restraining Counter-Defendants, their agents, employees, representatives, and all persons acting in concert with them from engaging in or continuing to pursue defamatory claims, assertions, or lawsuits against Hi-Tech with respect to alleged patent infringement. Hi-Tech is also entitled to injunctive relief against Counter-Defendants requiring them to issue corrective statements retracting all defamatory statements to third-parties, including but not limited to Hi-Tech's customers and the public, regarding Hi-Tech's alleged patent

infringement.

## COUNT IV

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND POTENTIAL BUSINESS RELATIONS

***Against ThermoLife and Kramer***

173. Hi-Tech incorporates by reference Paragraphs 1 through 172 above as though fully set forth herein.

174. Counter-Defendants knew of Hi-Tech's business relations with its customers and the importance of those relations to Hi-Tech's business.

175. Counter-Defendants tortiously interfered with Hi-Tech's business relations through improper and wrongful conduct including, but not limited to, the following:

d. Repeatedly filing meritless and fraudulent lawsuits against Hi-Tech in bad faith;

e. Falsely and misleadingly accusing Hi-Tech of infringing upon ThermoLife's patents, both in lawsuits and through correspondence to Hi-Tech's customers;

f. Defaming the business reputation of Hi-Tech;

g. Threatening to sue Hi-Tech's customers if they continued to sell

certain Hi-Tech products; and

h. Filing meritless and fraudulent lawsuits against Hi-Tech's customers.

176. In taking these improper and wrongful actions, Counter-Defendants acted without privilege.

177. In taking these improper and wrongful actions, Counter-Defendants acted purposefully and with malice with the intent to harm Hi-Tech's business or drive Hi-Tech out of business.

178. The Counter-Defendants' tortious conduct set forth herein induced third parties not to continue their business relationship with Hi-Tech, to limit their business relationship with Hi-Tech, or to not initiate a business relationship with Hi-Tech.

179. Counter-Defendants' tortious conduct proximately caused financial injury to Hi-Tech in an amount to be proved at trial.

**COUNT V**

**CIVIL CONSPIRACY**

***Against ThermoLife and Kramer***

180. Hi-Tech incorporates by reference Paragraphs 1 through 179 and all claims as though fully set forth herein.

181. Counter-Defendants conspired and agreed amongst themselves and

with others unknown to Hi-Tech to, among other things:

a. File meritless and fraudulent patent infringement lawsuits against Hi- Tech in bad faith;

b. Falsely and misleadingly allege that Hi-Tech was infringing upon ThermoLife's patents in lawsuits and correspondence to Hi-Tech's customers in bad faith;

c. Distribute false and misleading allegations that Hi-Tech was infringing upon ThermoLife's patents in the marketplace;

d. Disparage the goods and services of Hi-Tech through false and misleading assertions of fact;

e. Defame Hi-Tech; and/or

f. Tortiously interfere with Hi-Tech's business relations and potential business relations.

182. The object of the conspiracy, as outlined above, was itself a legal wrong. Counter-Defendants also took one or more actions in furtherance of the conspiracy and, in fact, accomplished the objective of the conspiracy to the injury of Hi-Tech.

183. Such conduct constitutes an agreement by, and among, Counter-Defendants and others unknown to Hi-Tech to commit an unlawful act, or to

commit a lawful act in a lawful manner as proscribed by law.

184. Counter-Defendants are, therefore, jointly and severally liable to Hi- Tech for their actions in conspiring as outlined above.

**COUNT VI**

**PUNITIVE DAMAGES**

***Against ThermoLife and Kramer***

185. Hi-Tech incorporates by reference Paragraphs 1 through 184 and all claims as though fully set forth herein.

186. Counter-Defendants' committed the violative, tortious, and conspiring actions, as set forth herein, willfully, maliciously, fraudulently, and with wantonness, oppression, and an entire want of care, which raises the presumption of indifference to the consequences, and entitles Hi-Tech to punitive damages in an amount sufficient to punish and deter such conduct by Counter-Defendants in the future.

**COUNT VII**

**ATTORNEYS FEES AND COSTS**

***Against ThermoLife and Kramer***

187. Hi-Tech incorporates by reference Paragraphs 1 through 186 and all claims as though fully set forth herein.

188. Counter-Defendants' committed the violative, tortious, and conspiring actions, as set forth herein, in bad faith and are liable for attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11.

189. Counter-Defendants have been stubbornly litigious and have caused Hi-Tech unnecessary trouble and expense in having to file these Counterclaims. Hi-Tech is entitled to an award of reasonable attorney fees and costs pursuant to O.C.G.A. § 13-6-11.

## COUNT VIII

## GEORGIA RICO
## VIOLATION OF O.C.G.A. § 16-14-4(a)

***Against ThermoLife and Kramer***

190. Hi-Tech incorporates by reference Paragraphs 1 through 189 and all claims above as though fully set forth herein.

191. Kramer is a "person" within the meaning of the Georgia RICO Law.O.C.G.A. § 16-14-1 et seq.

192. ThermoLife and its officers, agents, and employees, are each a person within the meaning of the Georgia RICO Law. O.C.G.A. § 16-14-1 et seq.

193. ThermoLife is an "enterprise" within the meaning of the Georgia

RICO Law. O.C.G.A. § 16-14-3(6).

194. Kramer was employed by, or associated with, ThermoLife within the meaning of the Georgia RICO Law. O.C.G.A. §16-14-4(b).

195. In committing the acts described above, ThermoLife, and its officers, agents, and employees, including Kramer, repeatedly acted in furtherance of an unlawful scheme.

196. The unlawful scheme included a scheme or artifice to deprive Hi-Tech of sales and profits by diverting Hi-Tech's customers and consumers by means of false or fraudulent pretenses or representations.

197. The unlawful scheme included a scheme or artifice for obtaining money or property from Hi-Tech by means of false or fraudulent pretenses or representations.

198. The unlawful scheme included a scheme or artifice to deprive Hi-Tech of money or property by wrongfully forcing Hi-Tech to incur attorneys fees and litigation expenses to defend itself against meritless claims by means of false or fraudulent pretenses or representations.

199. The unlawful scheme included a scheme or artifice to defame Hi-Tech by means of false or fraudulent pretenses or representations.

200. The fraudulent pretenses or representations made in furtherance of

the unlawful scheme set forth herein were material.

201. In furtherance of the unlawful scheme, and for the purpose of executing, and attempting to execute, that scheme, Kramer, ThermoLife, and their agents and employees repeatedly caused letters, pleadings, and other matters and things to be deposited with and delivered by the United States Postal Service and interstate couriers to various courts, Hi-Tech, and/or Hi-Tech's customers in repeated violation, or attempted violation, of 18 U.S.C. § 1341 (mail fraud).

202. In furtherance of the unlawful scheme, and for the purpose of executing, and attempting to execute, that scheme, Kramer, ThermoLife, and their officers, agents, and employees, repeatedly received letters and other matters and things from each other, and others, which were delivered by the United States Postal Service and interstate couriers in repeated violation, or attempted violation, of 18 U.S.C. § 1341 (mail fraud).

203. To the extent that any of these persons, Kramer, ThermoLife and their officers, agents, and employees did not participate directly in these acts of mail fraud, they knowingly and willfully caused, aided, abetted, counseled, commanded, induced or procured these violations of 18 U.S.C. § 1341 in violation of 18 U.S.C. § 2.

204. Kramer, ThermoLife, and their officers, agents, and employees could reasonably foresee the use of the United States Postal Service and interstate couriers in connection with the execution of this unlawful scheme.

205. Each of these "mailings" constitutes a separate incident of "racketeering activity" under Georgia RICO.

206. In furtherance of the unlawful scheme, and for the purpose of executing, and attempting to execute that scheme, ThermoLife, Kramer, and their officers, agents, and employees repeatedly transmitted, or caused to be transmitted, writings, signs, signals, pictures and sound communications transmitted in interstate commerce, including but not limited to, numerous interstate telephone calls, facsimile transmissions, email communications, and electronic submissions of documents, in repeated violation, of attempted violation, of 18 U.S.C. § 1343 (wire fraud). In furtherance of the unlawful scheme, and for the purpose of executing, and attempting to execute that scheme, ThermoLife, Kramer, and their agents and employees, repeatedly received, or caused to be received, writings, signs, signals, pictures and sound communications transmitted in interstate commerce, including but not limited to, numerous interstate telephone calls, facsimile transmissions, and email communications, in repeated violation, of attempted violation, of 18 U.S.C. §

1343 (wire fraud).

207. To the extent that any of these persons ThermoLife, Kramer, and their officers, agents, and employees did not participate directly in the wire fraud, they knowingly and willfully caused, aided, abetted, counseled, commanded, induced or procured these violations of 18 U.S.C. § 1343 in violation of 18 U.S.C. § 2.

208. Kramer, ThermoLife, and their officers, agents, and employees could reasonably foresee the uses of the interstate wire communications in connection with the execution of this unlawful scheme.

209. Each of these "interstate wirings" constitutes a separate incident of "racketeering activity" under Georgia RICO.

210. Each of the ThermoLife and Kramer's lawsuits against Hi-Tech, as set forth herein, constitutes a separate act of racketeering in that each suit constituted a separate effort to execute the scheme to defraud against Hi-Tech, and constitutes an attempted theft by taking in violation of O.C.G.A. § 16-8-12. ThermoLife and Kramer took a substantial step towards the completion of the acts each through the filing and litigation of each lawsuit.

211. Hi-Tech anticipates that in furtherance of the execution of this unlawful scheme, ThermoLife, Kramer, and their officers, agents, and

employees will violate the perjury and false swearing statutes of this state, O.C.G.A. §§ 16- 10-70 (perjury) and 16-10-71 (false swearing). Each violation of these statutes constitutes, or will when committed constitute, an additional separate incident of racketeering activity under Georgia RICO.

212. Each of these acts of racketeering activity was authorized, requested, commanded, performed, or recklessly tolerated by managerial officials of ThermoLife, including Kramer, and was done in furtherance of the execution of the unlawful scheme set forth herein by false representations, pretenses, and promises described herein.

213. The multiple acts of racketeering activity by ThermoLife, Kramer, and their officers, agents, and employees were part of a common and continuous pattern of fraudulent acts and schemes, were perpetrated for the same or similar purposes, and were not a series of disconnected, isolated or sporadic acts. They were part of the regular and routine way ThermoLife conducted its business. The multiple acts of racketeering activity by ThermoLife, Kramer, and their officers, agents, and employees constitute a "pattern of racketeering activity" as defined in O.C.G.A. § 16-14-4(8).

214. By reason of the foregoing, ThermoLife, Kramer and their officers, agents, and employees directly or indirectly, acquired or maintained control of a

business enterprise through a pattern of racketeering activity in violation of the Georgia RICO Act (O.C.G.A. § 16-14-4(a)).

215. As a direct and proximate result of these racketeering acts and this pattern of racketeering activity by ThermoLife, Kramer, and their officers, agents, Hi-Tech has been injured and damaged as set forth herein.

## COUNT IX

## GEORGIA RICO CLAIM VIOLATION OF O.C.G.A. § 16-14 -4(b)

***Against ThermoLife and Kramer***

216. Hi-Tech incorporates by reference Paragraphs 1 through 215 above as though fully set forth herein.

217. By reason of the foregoing, ThermoLife and/or Kramer and their managerial officials, agents, and employees have unlawfully, knowingly and willfully conducted and participated in, directly or indirectly, the affairs of ThermoLife through a pattern of racketeering activity in violation or attempted violation of O.C.G.A. §16-14-4(b). ThermoLife and/or Kramer's managerial officials, agents, and employees unlawfully, knowingly and willfully aided and abetted these violations and attempted violations of O.C.G.A. §16-14-4(b) in violation of O.C.G.A. §16-2-20.

218. As a direct and proximate result of these violations of O.C.G.A.

§16- 14-4(b) by Counter-Defendants, and their managerial officials, agents, and employees Hi-Tech has been injured and damaged as set forth herein.

## COUNT X

## GEORGIA RICO CLAIM VIOLATION OF O.C.G.A. § 16-14-4(c)

***Against ThermoLife and Kramer***

219. Hi-Tech incorporates by reference Paragraphs 1 through 218 above as though fully set forth herein.

220. By reason of the foregoing circumstances and events, ThermoLife and/or Kramer, and their managerial officials, agents, and employees individually and collectively, unlawfully, knowingly and willfully, combined, colluded, conspired, endeavored, and continue to combine, collude, conspire, and endeavored, to violate the provisions of O.C.G.A. §16-14-4(a) and (b) in violation of O.C.G.A. §16-14-4(c).

221. By reason of the foregoing circumstances and events, ThermoLife and/or Kramer, and their managerial officials, agents, and employees individually and collectively undertook overt acts in furtherance of their schemes as set forth herein.

222. As a direct and proximate result of these violations of O.C.G.A. §

16- 14-4(c) by ThermoLife and/or Kramer and their managerial officials, agents, and employees Hi-Tech has been injured and damaged as set forth herein.

## COUNT XI

### DECLARATORY JUDGEMENT: NON-INFRINGEMENT

***Against ThermoLife***

223. Hi-Tech incorporates by reference Paragraphs 1 though 222 above as though fully set forth herein.

224. Hi-Tech does not infringe any valid claim of Patent numbers 8,455,531; 8,466,187; or 8,183,288 ("the patents-in-suit") under 35 U.S.C. § 271(a).

225. Hi-Tech did not and does not induce others to infringe any valid claim of the patents-in-suit under 35 U.S.C. § 271(b).

226. Hi-Tech did not and does not contributorily infringe any valid claim of the patents-in-suit under 35 U.S.C. § 271(c).

227. Accordingly, Hi-Tech is entitled to a declaratory judgment of non-infringement of the claims of the patents-in-suit and to other relief that is just and proper.

## COUNT XII

### DECLARATORY JUDGEMENT:

**INVALIDITY OF THE PATENTS IN SUIT**

***Against ThermoLife***

228. Hi-Tech incorporates by reference Paragraphs 1 through 227 above as though fully set forth herein.

229. The patents-in-suit do not comply with the requirements of the Patent Act and, therefore, are invalid. In particular, the patents-in-suit do not comply with one or more of Title 35 U.S.C. §§ 101,102, 103, and/or 112.

230. Accordingly, Hi-Tech is entitled to a declaratory judgment of non-infringement of the claims of the patents-in-suit and to other relief that is just and proper.

**COUNT XIII**

**VIOLATION OF § 2 OF THE SHERMAN ACT**
**(*Walker Process* Claim)**

***Against ThermoLife and Kramer***

231. Hi-Tech incorporates by references Paragraphs 1 though 230 above as though fully set forth herein.

232. ThermoLife and Kramer obtained the patents-in-suit by knowingly and willfully misrepresenting and withholding material facts to the USPTO.

233. ThermoLife and Kramer, in enforcing the patents-in-suit, were

aware of their fraud when bringing suit.

234. ThermoLife and Kramer had deceptive intent when prosecuting the patents-in-suit.

235. The USPTO reasonably relied on ThermoLife and Kramer's misrepresentations and omissions, and the patents-in-suit would not have issued but for ThermoLife and Kramer's misrepresentations or omissions to the USPTO.

236. ThermoLife and Kramer had specific intent to control prices or destroy competition.

237. ThermoLife and Kramer engaged in predatory or anticompetitive conduct to accomplish their monopolization.

238. ThermoLife and Kramer have a probability of success in achieving their anticompetitive goals.

239. Hi-Tech has been injured by ThermoLife and Kramer's anticompetitive activities. Moreover, Hi-Tech has suffered antitrust injuries as a result of ThermoLife and Kramer's violations of the Sherman Act; that is, injury of the type the antitrust laws were intended to prevent and that flows from that which makes ThermoLife and Kramer's acts unlawful. Hi-Tech's injuries flow directly from ThermoLife and Kramer's predatory, anticompetitive, and

exclusionary conduct in monopolizing or attempting to monopolize the market for nutritional supplements.

240. As a result of ThermoLife and Kramer's violations of the Sherman Act, Hi-Tech is entitled to recover treble damages and its costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and it is entitled to injunctive relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT XIV

## VIOLATION OF § 2 OF THE SHERMAN ACT
## (*Hangards* Claim)

***Against ThermoLife and Kramer***

241. Hi-Tech incorporates by reference Paragraphs 1 through 240 above as though fully set forth herein.

242. ThermoLife and Kramer's infringement suits against Hi-Tech were objectively and subjectively baseless at the time the suits were filed.

243. ThermoLife and Kramer's infringement suits against Hi-Tech were objectively baseless because no reasonable litigant could realistically expect success on the merits.

244. ThermoLife and Kramer's infringement suits against Hi-Tech were motivated by a subjective intent to abuse the litigation process to interfere with

the business of Hi-Tech, rather than to obtain judicial relief. Hi-Tech has been injured by ThermoLife and Kramer's anticompetitive activities. Moreover, Hi-Tech has suffered antitrust injuries as a result of ThermoLife and Kramer's violations of the Sherman Act; that is, injury of the type the antitrust laws were intended to prevent and that flows from that which makes ThermoLife and Kramer's acts unlawful. Hi-Tech's injuries flow directly from ThermoLife and Kramer's predatory, anticompetitive, and exclusionary conduct in monopolizing or attempting to monopolize the market for nutritional supplements.

WHEREFORE, Counter-Plaintiff Hi-Tech Pharmaceuticals, Inc. respectfully requests this Court:

1. Enter judgment in favor of Hi-Tech, and against ThermoLife and Kramer on each count of the Complaint and on each count of their Counterclaims;

2. Enter judgment declaring that Hi-Tech and its customers did not infringe any of the patents-in-suit.

3. Enter judgment declaring that the patents-in-suit are invalid.

4. Enter judgment against Counter-Defendants for such sums as compensatory damages, trebled, as the evidence shall show the Counter-Defendants to be justly entitled to recover pursuant to

OCGA § 16-14-6(c), as well as punitive damages for deterrence in an amount sufficient to keep such wrongful conduct from being repeated, attorney's fees and litigation expenses, interest, if applicable, and all costs of this action;

5. Grant Hi-Tech injunctive relief and compensatory, general, treble, and punitive damages as otherwise set forth herein;

6. Enter judgment declaring that this case is exceptional in favor of Hi- Tech under 35 U.S.C. § 285 and that Hi-Tech be awarded its reasonable attorney fees and expenses;

7. Award Hi-Tech attorneys fees and costs as otherwise set forth herein;

8. Award Hi-Tech pre and post-judgment interest as otherwise set forth herein; and

9. Such other relief as the Court and jury deem proper, including, but not limited to, any of the orders or judgments against any or all of the Counter-Defendants as are authorized.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and all

applicable law, Hi- Tech Pharmaceuticals, Inc. requests a trial by jury on all issues so triable.

Dated: September 14, 2015


*S/ Edmund J. Novotny*
Edmund J. Novotny, Jr.
Georgia Bar No. 547338
Charles R. Bridgers
Georgia Bar No. 080791
*Counsel for Hi-Tech Pharmaceuticals, Inc.*

101 Marietta Street
Suite 3100
Atlanta, Georgia 30303
Tel: 404-979-3150
Fax: 404-979-3170
ednovotny@novotnylawgroup.com

*S/Arthur W. Leach*
Arthur W. Leach
Georgia Bar No. 442025
C.L. Parker
Georgia Bar No. 722011
*Counsel for Hi-Tech Pharmaceuticals, Inc*

The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
Tel: 404-786-6443
Fax: 678-624-9852
Art@ArthurWLeach.com
CL@clparkerllc.com

*S/ John T. Gallagher*
John T. Gallagher
*Attorney for Hi-Tech Pharmaceuticals, Inc.*
Admitted *pro hac vice* in Case No. 1:15-cv-00892-ELR
*Counsel for Hi-Tech Pharmaceuticals, Inc*

Hoffmann & Baron, LLP
6900 Jericho Turnpike
Syosset, New York 11791
Telephone: (516) 822-3550
Facsimile: (516) 822-3582
jgallagher@hbiplaw.com

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to L.R. 5.1C and 7.1D of the Northern District of Georgia, that the foregoing document complies with the font and point selections approved by the Court in L.R. 5.1C. The foregoing pleading was prepared on a computer using 14-point Times New Roman font.

*/s/ Arthur W. Leach*

Arthur W. Leach
Ga. Bar No. 442025
C.L. Parker
Ga. Bar No. 722011
The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
Telephone: (404) 786-6443
Facsimile: (678) 624-9852
Art@ArthurWLeach.com
CL@clparkerllc.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 14th day of September, 2015, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

*/s/ Arthur W. Leach*
Arthur W. Leach
Ga. Bar No. 442025
C.L. Parker
Ga. Bar No. 722011
The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
Telephone: (404) 786-6443
Facsimile: (678) 624-9852
Art@ArthurWLeach.com
CL@clparkerllc.com

*Attorneys for Defendants*